**UNITED STATES of America, Plaintiff,**

v.

**Joy Jimmy NEAL, Defendant.**

**No. CR–80–04–D.**

United States District Court,
W.D. Oklahoma.

Sept. 26, 1991.

ORDER

DAUGHERTY, Senior District Judge.

The Movant in this case has filed a 28 U.S.C. § 2255 Motion *pro se* attacking the validity of his convictions in the above case

in 1980. The Government has responded and the Movant has replied thereto. The matter was referred to a Magistrate Judge for initial proceedings pursuant to 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge found an evidentiary hearing to be unnecessary and that the issues raised by the Movant could be resolved on the basis of the record.

The Magistrate Judge filed a Report And Recommendation concerning the Movant's § 2255 Motion on July 30, 1991. The Magistrate Judge found that all of the Movant's claims of ineffective assistance of one of his two attorneys by a conflict of interest to be without merit for the reason that the Movant failed to show an actual conflict of interest possessed by this attorney which adversely affected his performance as one of his attorneys, and moreover failed to show an alternative defense to any of the three charges involved that would have been inherently in conflict with such attorney's other loyalties or interests. The Magistrate Judge also found that the Movant should not prevail on his claim that there was perjured testimony used against him at trial, as Plaintiff has failed to show the use of perjured testimony against him as well as the other elements to support such claim. As a result, the Magistrate Judge recommended that the Movant's 28 U.S.C. § 2255 Motion be found to be without merit and be denied. As provided by 28 U.S.C. § 636(b)(1)(B), the Movant was given 20 days from the date of the filing of the Magistrate Judge's Report And Recommendation to object thereto. The Movant's Objection was filed on August 13, 1991, and thus is now before this Court.

In accordance with 28 U.S.C. § 636(b)(1)(B), this Court has examined *de novo* the findings contained in the Report And Recommendations of the United States Magistrate Judge, the Defendant's Objections thereto, as well as the Defendant's § 2255 Motion and the Government's response. It is the opinion of this Court that, for the reasons stated below, there is no need for an evidentiary hearing on the Defendant's Objections.

As has been stated, one of the Defendant's claims in his § 2255 Motion involves the alleged ineffective assistance of counsel due to a conflict of interest on the part of one of his trial attorneys. The standard for determining ineffective assistance of counsel due to a conflict of interest has been clearly delineated by the United States Supreme Court and our Circuit. "In order to find that the Defendant was denied effective assistance of counsel, we would have to find that the conduct of his attorney 'so undermined the proper functioning of the adversary process that the truth cannot be relied on as having produced a just result.' " *U.S. v. Galloway*, 937 F.2d 542 (10th Cir.1991) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The Tenth Circuit has stated in another case:

> It is clear that the right to counsel guaranteed by the Sixth Amendment includes the "right to representation that is free from conflicts of interest". *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). Because the Defendant lodged no Sixth Amendment objection at trial, we can disturb his conviction only if he demonstrates "that an actual conflict of interest adversely affected his lawyer's performance". *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980) ... [W]e hold that defense counsel's performance was adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interest. *Brien v. United States*, 695 F.2d 10, 15 (1st Cir.1982).

*U.S. v. Bowie*, 892 F.2d 1494, 1500 (10th Cir.1990).

In the very recent case of *Church v. Sullivan*, 942 F.2d 1501 (10th Cir.1991), the Tenth Circuit reaffirmed the above-stated principles regarding conflict of interest and held that if a movant is able to show the existence of an "actual conflict" within the meaning of *Cuyler, supra,* he would be entitled to "an evidentiary hearing in which

he might develop facts sufficient to prove that the conflict adversely affected his representation." *Church, supra,* at 1510. In the *Church* case, *supra,* the Tenth Circuit found an actual conflict of interest entitling Church to an evidentiary hearing because Church's lawyer had previously represented the man that Church claimed to be his accomplice in the robbery that was the basis of his conviction. The Tenth Circuit cited the *Bowie* case, *supra,* for the proposition that "[w]hen defense counsel has previously represented a government witness in a related case, the primary conflict of interest concern is that defense counsel may not be able to effectively cross-examine the witness for fear of divulging privileged information." *Church, supra,* at 1511, citing *Bowie, supra,* at 1501. In *Church,* the alleged accomplice did testify and was questioned by Church's lawyer about his involvement in the robbery. The Court found that because of the lawyer's previous representation of the alleged accomplice, that it was likely that there were areas in which the lawyer would be hindered in conducting a full and fair cross-examination for the benefit of his present client, Church. As a result, the Tenth Circuit found that the "actual conflict" standard of *Cuyler* was met.

An examination of the Movant Neal's § 2255 Motion reveals that his allegations fall far short of those found by the Tenth Circuit to be an "actual conflict" in *Church, supra.* In his § 2255 Motion, Movant Neal contends that his trial attorney, Albert Matthews, "was dealing with the government witnesses." (Motion, at 6). He then goes on to state that Matthews was vice-president of JaBo Cattle Company in Belize, and that that cattle company had done business with Joe Curtis Baker and others. Neal alleges that Matthews and the government withheld Baker's past criminal record. Finally, Neal asserts that Albert Matthews was also the attorney for Jackie Boles, the wife of Robert Boles, and that Jackie Boles allegedly "followed the plane up from Belize to inspect the drugs that Baker and Boles loaded on the plane." (Motion, at 7.) Matthews had allegedly previously represented Jackie Boles at

some earlier time in a rape case. Even accepting all of these allegations as true for purposes of this Motion, this Court is convinced, as was the Magistrate Judge, that the above facts simply do not establish an "actual conflict" so as to require a further evidentiary hearing.

■ The fact that Albert Matthews was involved with the JaBo Cattle Company in Belize, as was Movant Neal, in no way establishes that Matthews would necessarily have interests that would conflict with his effective representation of Neal. The business of JaBo Cattle Company would be in no way related to the charges brought against Neal, and thus there would be no potential for conflict or any potential difficulty in conducting an effective cross-examination of witnesses.

Movant's allegation that attorney Matthews was "dealing with government witnesses" also does not establish a conflict. The Movant does not specify what sort of dealings he is referring to, but this Court will assume that the Movant is referring to the referenced business dealings of JaBo Cattle Company with Joe Curtis Baker and other witnesses. Thus, any dealings that Matthews would have had with the government witnesses would have been on entirely separate and unrelated business matters, and would in no way impact upon Matthews' ability to function effectively in his representation of Neal. Movant has made absolutely no showing that Matthews' involvement with JaBo Cattle Company would be in any way inconsistent with Movant's interests at trial. "A mere possibility of conflict of interest does not rise to the level of a Sixth Amendment violation," *Smith v. White,* 815 F.2d 1401, 1404 (11th Cir.1987), citing *Cuyler, supra,* and Movant Neal has shown no more than that to this Court.

■ Neal's allegations concerning Matthews' dealings with Jackie Boles do not establish the existence of an "actual conflict" any more than his allegations concerning the JaBo Cattle Company. While Neal does state that Jackie Boles "followed the plane up from Belize to inspect the

drugs" (Motion, at 7), and that Jackie Boles was Matthews' client at the time, Movant still does not establish that there was any conflict because of Matthews' representation of Jackie Boles in a prior, and completely unrelated, rape case.

■ Count III of the Indictment against Joy Jimmy Neal involved the distribution of cocaine directly to Joe Curtis Baker. Even if it was true that Jackie Boles was somehow involved in the transfer of cocaine, her alleged involvement was not part of Count III in the Indictment against Movant Neal. Jackie Boles was not a witness at Movant's trial, and thus Matthews' ability to conduct a full cross-examination was not affected by any prior representation of Jackie Boles. If Movant's allegations are interpreted to mean that his counsel was at fault in failing to call Jackie Boles to testify at his trial, then this Court is in agreement with the findings of the Magistrate Judge that Movant has failed to indicate any favorable testimony or helpful evidence that could have been elicited from Jackie Boles. It bears repeating that a mere possibility of conflict of interest is not enough. This Court is of the opinion that the Movant has done nothing but make bare and conclusory allegations. He has not shown this Court any specific instances indicating a clear conflict of interest, and this Court is unwilling to assume such a conflict.

As has been stated, the Movant asserts that his trial attorney Matthews withheld the fact of the government's chief witness's past criminal record. This Court is in complete agreement with the Magistrate Judge that the testimony at trial showed that witness Baker was incarcerated at the time of his testimony, after pleading guilty to conspiracy to distribute cocaine, and that he had also received a suspended sentence for possession of marijuana. As a result, there is obviously no basis for Movant Neal's assertion that his attorney and the government withheld this evidence.

Movant also alleges that his representation was inadequate because of his counsel's failure to call a witness to testify at trial. After reviewing the Motion with supporting affidavits, this Court is in agree-

ment with the Magistrate Judge that his attorney's decision not to call this witness was a legitimate trial strategy decision and that does not support a claim of ineffective assistance of counsel. *See, United States v. Miller*, 907 F.2d 994 (10th Cir.1990). The Magistrate Judge is correct in his holding that "[c]ounsel's decisions regarding what witnesses to call and what evidence to present at trial carry a strong presumption of effectiveness." Report and Recommendation, at ——. As a result, this Court finds that this basis for the Movant's claim of ineffective assistance of counsel to be without merit.

■ In addition, it is undisputed that the Movant did not raise his Sixth Amendment ineffective assistance of counsel objection either at trial, during his direct appeal, or during his first § 2255 Motion. As a result, and as *Cuyler, supra*, indicates, even if an actual conflict of interest was alleged by the Movant, he must also show that that conflict adversely affected his lawyer's performance. This Court is in complete agreement with the Magistrate Judge that the trial attorneys provided effective and thorough representation for the Movant, and that the Movant has shown absolutely no additional plausible defense that was not pursued by counsel due to his alleged conflict of interest. It bears repeating at this point that the Movant was represented by two attorneys during his trial, and had the benefit of both regarding defenses and trial strategy.

■ This Court is also in agreement with the Magistrate Judge's findings that the Movant should not prevail on his claim that perjured testimony was used against him. It is clearly established, as stated in the Report and Recommendations of the Magistrate Judge, that the Movant must show (1) that the witness actually lied in his testimony; (2) that the Government knew or should have known the testimony to be false; and (3) that there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. *Costanzo v. United States*, 758 F.Supp. 869, 874 (S.D.N.Y.1990). The Movant has made only bare allegations to support his

claim that the witness Joe Curtis Baker lied at trial and has completely failed to show that the Government knew or should have known about the alleged perjured testimony or that any alleged perjured testimony was in fact material to the outcome of the case. The Movant apparently contends that Baker claimed to know an involved party only by his first name, when in fact both men were well acquainted. Even if this statement is taken as true for purposes of this Order, it is simply not material, and would not have affected the outcome of the Movant's trial. The Movant also alleges that two Oklahoma state agents committed perjury, but he does not state what "fraudulent" statements were made, or what the effect of the alleged "fraud" was. As a result, there is no basis for relief by this Court.

 Accordingly, it is this Court's *de novo* determination that the Report And Recommendation of the Magistrate Judge should be accepted in full and adopted by this Court.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

ARGO, United States Magistrate Judge.

Movant, a federal prisoner, has filed a 28 U.S.C. § 2255 motion *pro se* attacking the validity of his conviction. The government has responded and the Movant has replied thereto. Thus, the motion is at issue. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing is unnecessary, inasmuch as the issues raised by Movant may be resolved on the basis of the record.

### I.

After trial by jury, Movant was convicted on each count of a three-count indictment charging him with (1) using extortionate means to collect an extension of credit to one Joe Curtis Baker in violation of 18 U.S.C. § 894; (2) possessing an unregistered firearm defined as a destructive device, namely a one-gallon plastic jug, flam-mable liquid and rag wick, in violation of 26 U.S.C. § 5861(d); and (3) distribution of approximately eight ounces of cocaine in violation of 21 U.S.C. § 841(a)(1). Movant was sentenced to concurrent terms of ten years imprisonment on each count, and the conviction was affirmed on appeal. *United States v. Neal,* 692 F.2d 1296 (10th Cir. 1982). The relevant facts as found by the Tenth Circuit are as follows:

Government witness Joe Curtis Baker testified that he met Neal in October of 1978 while Neal was involved in the cattle business in Belize. Baker was also involved in the cattle business and in late October or early November he flew with Neal to Belize where Baker met Robert Boles, Neal's business partner. Subsequent to this trip Neal and Baker on numerous occasions discussed the possibility of selling cocaine. (IV R. 101).

Baker testified that Neal told him that Boles was a source of supply for cocaine and that Neal wanted to know if Baker could distribute cocaine once purchased. (IV R. 103). Baker told Neal that he did have a source of distribution and the two entered into an agreement to purchase and distribute cocaine whereby Baker was to transport, distribute, and partially finance the purchase while Neal was to provide money and receive a percentage of the profits for his investment and for introducing Baker to Boles. (IV R. 105).

The money was secured and Baker arranged for a private plane to fly to Belize to pick up two to four kilos of cocaine. Subsequently, Baker and a pilot flew the plane from Abilene, Texas, to Belize where it was loaded with 600 pounds of marijuana rather than the expected two to four kilos of cocaine. (IV R. 108, 198). Neal was not at the Belize airport when the pickup occurred. Baker and the pilot then returned to Abilene where the plane was unloaded and one half of the load was stored near the home of one Joe Connell. (IV R. 198). An employee of Neal's, known by Baker only as Gerald, was also present when the plane arrived. Baker then brought the remaining half of the load with him to Oklahoma City,

Oklahoma. Upon Baker's arrival in Oklahoma City he telephoned Neal and informed him that the contraband was marijuana instead of cocaine. (IV R. 110).

Soon thereafter, in late January or early February of 1979, Baker and Neal again attempted to arrange a cocaine purchase. (IV R. 114). This time, Neal represented that he could purchase cocaine from contacts in California. (IV R. 115). Neal purchased commercial airline tickets for Baker and one Monty Hudson to fly to Los Angeles so that he could inspect the product and deal with the source. (IV R. 115–16, 266–68, Pl. Exh. 17). Upon arrival in Los Angeles, Baker and Hudson were picked up by Neal's wife, Jeri, a nephew, and a niece and were taken to the nephew's apartment where a sample of the cocaine was tested by Baker. (IV R. 117, 121–22). Though the cocaine could not be delivered that night, Baker left $9,000 with Hudson and Jeri Neal, flew back to Oklahoma City, and contacted defendant Neal about the aborted connection. (IV R. 123). Neal assured Baker that he would contact his wife and Hudson and go to California himself to obtain the cocaine. (IV R. 124). A few days later Neal called Baker, told him he had returned from California, and set up a rendezvous at an Oklahoma City bar. (IV R. 125–26). At the rendezvous, Neal and one Alan McElhaney delivered eight ounces of cocaine to Baker. (IV R. 127).

Profits from the sale of the cocaine were to be divided between Neal and Baker. (IV R. 134). In fact, however, nothing had been done with the marijuana obtained in the Belize transaction and, in the interest of getting back his initial investments in that affair, Baker withheld the majority of the profits from the cocaine sales. (IV R. 136–37). In that regard Baker testified that he did not give Neal his full share "[b]ecause he didn't deserve it" and that he "gave [Neal] some of the money; not very much, though." (IV R. 136, 235).

Baker further testified that by mid-February Neal began trying to collect money from him. According to Baker, Neal made numerous phone calls from motels in the Oklahoma City area demanding money and threatening Baker with physical harm to him or his family. (IV R. 142–45, 251). During this same period Neal met with Baker and his ex-wife, Reba Mae Baker, at a Mac Donald's restaurant in the Oklahoma City area and told Baker that "things would happen to [him]" if he did not pay. (IV R. 139, 142). Similarly, Reba Mae Baker testified that Neal said that her husband "better come up with the money if he cared anything about his family." (IV R. 370, 388–89). Both Joe Curtis Baker and Reba Mae Baker testified that these threats frightened them to some extent. (IV R. 143, 374).

In late February of 1979, Neal contacted numerous others in an attempt to collect the money. Joe Elliott Baker, Baker's father, testified that Neal twice called him in search of his son and that on another occasion Neal came to his house and told him that "it would be very embarrassing for the family and could be an international incident ... [i]f [Neal] didn't get the money by the next morning." (IV R. 330). Lucien Kempf, a friend of Baker's, had three separate encounters with Neal, during the last of which Neal told Kempf to set up a meeting with Baker and that Kempf's failure to do so "might mean some bad publicity for [Kempf]." (IV R. 354).

On the night of March 1, 1979, Baker returned to his home in Pink in Pottawatomie County, Oklahoma, and found the front of the house on fire, the front window broken out, and a jug containing gasoline on the living room floor. (IV R. 152; Pl. Exhs. 2, 3 and 4). Ted Maxifield, an employee of Baker's was with Baker at the time and corroborated his story at trial. (V R. 627–30).

An expert in the field of forensic chemistry testified that the liquid in the jug was a flammable hydrocarbon. (V R. 697). Deputy Sheriff Kayle Parker found a cigarette lighter approximately five to six inches from an area of burned

grass outside the house (V R. 613), and a gasoline drenched rag was found beneath the broken window, also outside the house. An enforcement officer with the Bureau of Alcohol, Tobacco, and Firearms (ATF) testified that it was his expert opinion that if these materials had been assembled, it "would indeed be an incendiary bomb." (V R. 756, 758). The Government also introduced in evidence a document from the ATF certifying that there was no record that Neal had registered an incendiary device (molotov cocktail) as required by law. (Pl. Exh. 16).

Earlier in the day of the fire-bombing incident, Shelia Rider, a neighbor of Baker's, returned home from work at around 4:00 p.m. and observed a pink Cadillac with a Texas license plate parked in front of her house and defendant Neal at her front door. Neal asked Rider where Baker lived, she told him, and he left in the Cadillac. (V R. 488, 539).

Government witness Donald Webster, a prisoner in the Major County jail, testified that after the fire-bombing incident Neal admitted to him that he had burned Baker's home. Webster also testified that Neal told him that he planned to kill Baker if Baker did not pay him $147,000.

Neal testified in his own behalf and denied ever having any involvement with cocaine, marijuana, or any other drugs. (V R. 831–32). Neal also denied threatening Baker, Baker's family, or Baker's friends. (V R. 825, 849–50). Further, Neal claimed that his trip to California was for the purpose of talking with the British Consulate in Los Angeles about establishing permanent residence in Belize. Neal also denied possessing any incendiary device. (V R. 875–76).

*United States v. Neal,* 692 F.2d at 1299–1301.

The Government's response to the 28 U.S.C. § 2255 motion asserts that this is Movant's second 28 U.S.C. § 2255 motion. Movant's first motion was filed and denied

by the Court in 1984 for the reason that it raised the same issues that were previously decided adversely to Movant in his direct appeal. Petitioner's direct appeal asserted six claims: (1) Count I of the indictment was fatally defective for its lack of specificity, (2) Count II was defective in that it failed to charge that the destructive device was designed for use as a weapon; (3) the trial court erred by refusing to sever the various counts and by refusing to order the Government to elect the counts on which it intended to proceed; (4) the offense alleged in Count II is a lesser included offense of that alleged in Count I, resulting in multiple punishments for the same offense in violation of the double jeopardy clause; (5) defendant was denied his right to a fair trial due to the tainting of the jury by one juror's misconduct; and (6) such errors, combined with the insufficiency of the evidence as to all counts, improper admission of physical evidence, improper admission of testimony of other crimes and the allowance of an in-court identification which was tainted by an impermissibly suggestive pretrial identification, when cumulated, deprived defendant of a fair trial. *United States v. Neal,* 692 F.2d at 1299.

## II.

In this second 28 U.S.C. § 2255 motion to vacate,[1] Movant urges that one of his two trial attorneys, Albert Matthews, rendered ineffective assistance of counsel by virtue of a conflict of interest in that Mr. Matthews was a vice president of JaBo Cattle Company in Belize. Movant contends that Mr. Matthews was "dealing with government witnesses," (motion p. 6) namely Joe Curtis Baker, Don Webster, Carl Beasley and Monty Hudson.[2] Without explaining why, Movant asserts that his attorney could not question Baker or Webster without involving himself. Movant further alleges that his attorney and the government withheld Baker's past criminal record. Additionally he alleges that Jackie Boles, the

---

**1.** The government makes no argument that the motion should be dismissed as a delayed or successive motion pursuant to Rule 9, Rules Governing Section 2255 Proceedings.

**2.** Neither Beasley nor Hudson testified at trial.

wife of the president of the cattle company, was Matthews' client at the time of the drug transfer from Belize and at the time of Movant's trial. Movant also alleges Matthews represented Jackie Boles in a rape case at some unspecified time.

Movant further claims that counsel was constitutionally inadequate when he declined to call Roy Reid as a witness to testify about Movant's car and motor home as well as certain statements made by an individual named Carl Beasley.

Finally, Movant alleges that the charges were based on fraudulent statements by Baker, agent Jerry Tate and OSBI agent Gary Davis.[3]

### III.

■ In general, the analysis for ineffective assistance of counsel claims is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): The defendant must show counsel's representation falls outside the wide range of professionally competent assistance and that there is a reasonable probability that but for counsel's conduct the result of the proceedings would have been different.

■ In *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court articulated the standard for assessing ineffective assistance of counsel claims based on conflict of interest: "In order to demonstrate a violation of a Sixth Amendment right a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350, 100 S.Ct. at 1719. Once such conflict is established, prejudice is presumed under the "error plus prejudice" analysis for ineffective assistance of counsel cases. *Strickland v. Washington,* 466 U.S. at 692, 104 S.Ct. at 2067.

As the Tenth Circuit explained in *United States v. Soto Hernandez,* 849 F.2d 1325, 1328 (10th Cir.1988):

> The sixth amendment entitles a criminal defendant to an attorney free of interests that actually conflict with those of the accused. This right is not limited to

cases involving joint representation of co-defendants at a single trial, but extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person. To prevail on an ineffective assistance claim of this variety "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Once an actual conflict and an adverse effect are shown, an accused need not show prejudice to receive relief.

849 F.2d at 1328 (citations omitted).

Movant only now, more than ten years after his trial, claims that Matthews had a conflict of interest. This issue was not raised at trial, on direct appeal, or in Movant's first § 2255 motion. When a defendant raises no objection at trial, he must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Newman v. United States,* 817 F.2d 635, 636 (10th Cir.1987) (*quoting Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718 (defendant who failed to object to trial counsel's prior association with a grand jury witness against defendant showed no actual conflict of interest that adversely affected performance). *See also, United States v. Bowie,* 892 F.2d 1494 (10th Cir.1990). Such an adverse effect on counsel's performance "must be established by specific instances in the record." *United States v. Roth,* 860 F.2d 1382, 1389 (7th Cir.1988) *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661 (1989). The mere "possibility of divided loyalties is insufficient proof of actual conflict; rather the defendant must show specific instances where his attorney 'could have, and would have, done something different'" absent the conflict. *Roth,* 860 F.2d at 1389 (*quoting United States v. Cirrincione,* 780 F.2d 620, 630–31 (7th Cir.1985). *See also, United States v. Jones,* 900 F.2d 512, 519 (2d Cir.) *cert. denied,* —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990).

Movant must point to something in the record to suggest that Matthews' conduct was motivated or influenced by the pur-

---

**3.** Davis did not testify at trial.

ported conflict stemming from his role as legal counsel and part owner of JaBo Cattle Company and as the alleged counsel to Jackie Boles (not a witness at trial).

■ To show that defense counsel's performance was adversely affected by an actual conflict of interest, Movant must show that a "specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests." *United States v. Bowie*, 892 F.2d at 1500. In *Bowie*, the Court cited with approval *Brien v. United States*, 695 F.2d 10, 15 (1st Cir.1982), wherein the Court explained:

"In order to establish an actual conflict of interest, the petitioner must ordinarily prove two elements. First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it would have been used, but merely that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with the attorney's other loyalties or interests." (citations omitted).

■ The facts relevant to Movant's ineffective assistance of counsel claims and conflict of interest claims are as follows. Movant testified that he was a part owner of the JaBo Cattle Company. (TR. 810–812). He was represented by two attorneys at trial, one of whom served as counsel for the company, according to Movant's testimony. (TR.873). Movant also testified that this same counsel, Matthews, was a part owner of the company. (TR.874). The record reflects that counsel Matthews conducted thorough and thoughtful cross-examination of the government witnesses which he cross-examined. Joe Curtis Baker, the government's principal witness, was cross-examined by co-counsel Ferguson. (TR.163–249, 254).

As to Movant's claim that Matthews was "dealing with government witnesses" and that he could not question Baker or Webster without involving himself, the under-signed notes that Movant never contended that he was unaware that Matthews was counsel for JaBo Cattle Company. Thus, it is clear that Movant was aware at the time of trial that Matthews might know individuals who allegedly had business dealings with the company. Movant makes no allegation that any of the purported prior dealings with the government witnesses were directly related to the case for which Movant was being tried. *See United States v. Bowie*, 892 F.2d at 1501 (allegations by defendant that his counsel curtailed admitted dishonesty impeachment of government witnesses because it implicated defense counsel in wrongdoing did not establish Sixth Amendment conflict of interest because the prior incident was not directly related to the instant case and the only possible trial use would have produced danger of litigating collateral matters).

As to counsel's alleged dealing with the government witnesses, Movant has failed totally to show what plausible defense was not pursued and how such defense would have been inherently in conflict with counsel's interest in either JaBo Cattle Company or his alleged representation of Jackie Boles. To the extent that Movant claims that Matthews' cross-examination of Joe Curtis Baker was somehow deficient, his claim must factually fail because the record shows counsel Ferguson conducted that cross-examination. Matthews did cross-examine Don Webster who had testified on direct examination that Movant admitted burning Baker's home and that Movant intended to kill Baker if Baker did not pay Movant back the money Baker allegedly owed Movant. (TR.768–769). On cross-examination Matthews attacked Webster's credibility on the grounds that Webster had the opportunity to corroborate his story with Baker when both were confined in the same jail. (TR.770–771). Movant fails to point out any material line of questioning or a plausible defense which was avoided because of Matthews' interest in JaBo Cattle.

Movant also alleges that his trial attorney and the government withheld the criminal record of Joe Curtis Baker and the fact

that he had previously testified for the government. Although it did not appear that there was any specific evidence on the issue of whether or not Baker had previously testified for the government, the testimony at trial clearly reflected that Baker was incarcerated and was serving a sentence at the time of his testimony. (TR–Vol. I, pp. 93–94, 163). Specifically, Baker testified that in November 1979, he pleaded guilty to conspiracy to distribute cocaine and received a three-year sentence. (TR–160–161). Pursuant to a plea agreement, three counts of the four-count indictment were dropped. He also testified that in 1972, he received a suspended sentence for possession of marijuana. (TR–160–162).

Movant's claim that an actual conflict of interest precluded Matthews from calling Jackie Boles as a witness is unfounded. Movant claims that Jackie and Robert Boles brought the drugs involved in this case into the country and were part owners of JaBo Cattle Company, Ltd. and that the government and attorney Matthews withheld this information from the Court. (Movant's statement of facts paragraph 7). According to Movant's motion, Jackie Boles was also Matthews' client and he represented her in a rape case at some unspecified time. At trial, Movant testified Mrs. Boles went with him to Joe Curtis Baker's house for a social visit in January. Movant also testified that he never saw her deal in any kind of narcotics. (TR.830). Jackie Boles was not called as a witness at trial. Movant now claims that she is responsible for bringing the drugs into Oklahoma that were involved in Movant's case. Movant offers no evidence as to what Jackie Boles could have said that would exculpate Movant on the charges he faced, namely: using extortionate means to collect an extension of credit; possessing an unregistered firearm defined as a destructive device; and distribution of approximately eight ounces of cocaine. Movant fails to show what helpful evidence could be elicited from Jackie Boles or how any possibly helpful evidence would have adversely affected counsel's interest. Movant fails to show what potential defense was foreclosed from being pursued because of counsel's interest

in the JaBo Cattle Company or in any matters in which Matthews represented Boles. Especially where the defense is predicated on Movant's contention that all his dealings were strictly related to the cattle feed business and not drugs, statements from Jackie Boles that she was importing drugs would not strengthen Movant's case.

## IV.

Movant also contends that counsel Matthews rendered constitutionally inadequate assistance by failing to call Ray Reid. In support of his claim, Movant attaches an affidavit from Ray Reid. (Movant's attachment E). The affidavit states that Reid was prepared to testify at Movant's trial, that he met with Movant and Matthews who decided that Reid's testimony concerning the Cadillac was common knowledge and that none of his testimony would sway the case. According to the affidavit, Reid was prepared to testify that the Cadillac driven by Movant never had a "continental kit" and that he was with Movant when Movant bought a motor home. In the affidavit, Reid also stated that an individual named Carl Beasley gave a statement to the federal agent in return for immunity and a stipulation that Beasley "wouldn't have to testify in court concerning statements that stated that Bob Neal had sworn a vendeta [sic] of death on himself, Carl Beasley and Don Webster." (Movant's attachment E).

These allegations supporting the ineffective assistance of counsel claim relate to counsel's strategy decisions at trial and do not support an inference of ineffective assistance of counsel. Counsel's decisions regarding what witnesses to call and what evidence to present at trial carry a strong presumption of effectiveness. It is Movant's responsibility to show that counsel's alleged deficiencies in these areas were not a matter of sound trial strategy. *United States v. Miller*, 907 F.2d 994, 1002 (10th Cir.1990). Movant does not argue that Matthews' decision not to call Reid as a witness was the result of a conflict of interest, and the decision to omit Reid as a

witness did not render counsel's representation constitutionally inadequate.

The Court finds that all of Movant's claims of ineffective assistance of counsel and conflict of interest are without merit for the reason that Movant fails to show what possible plausible defenses were foreclosed. Nor has Movant identified how counsel's interest would be inherently in conflict with any other possible defense.

## V.

■ Movant also alleges that the government and his attorney Matthews knew that there was perjured testimony used against him. (See grounds 1 and 3). Movant alleges that the state agents Tate and Davis lied and that Baker had previously given statements to the government in other cases. In support of his claim that Baker lied, Movant points to Baker's testimony that he met an individual who was employed by Movant and who was known by Baker only as Gerald. Movant argues that the government and Matthews knew that Gerald was living in Baker's home while he was making the five trips to see Boles in Belize and that he gave Baker the money for the drug buy. Movant attempts to bolster this argument by attaching an affidavit from another convict, Glover, who states he was convicted by the false testimony of a government witness, i.e. Baker. (Movant's attachment H).

To prevail on his claim that there was perjured testimony used against him, Movant must show: (1) that the witness actually lied in his testimony; (2) that the government knew or should have known the testimony to be false; and (3) that there is a reasonable likelihood that the false testimo-

ny could have affected the judgment of the jury. *Costanzo v. United States*, 758 F.Supp. 869, 874 (S.D.N.Y.1990).

Movant must thus provide more than conclusory allegations to support his claim that the principal witness against him, Joe Curtis Baker, lied. Movant has failed to show that Baker committed perjury, that the alleged perjury testimony was material or that the government knew or should have known it was perjury. The statement that Baker had previously given a statement in an unrelated case involving an individual named Glover, is not relevant to Baker's testimony in Movant's case. Nor is there any basis for relief on the bare allegations of perjury by the state agents Davis (who did not testify at trial) and agent Tate.

## RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the 28 U.S.C. § 2255 motion be found to be without merit and be denied. The Clerk is directed to mail a copy of this report and recommendation to the Movant and to the United States Attorney. The parties are advised that they may object to this report and recommendation within twenty (20) days from the date hereof as provided in 28 U.S.C. § 636(b)(1)(B), and Local Court Rule 39.

ENTERED this 30th day of July 1991.